## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**STACI ALVARADO (#536553)**                         **CIVIL ACTION NO.**

**VERSUS**                                                          **17-339-BAJ-EWD**

**FREDERICK BOUTTE**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on August 28, 2020.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

STACI ALVARADO (#536553)                              CIVIL ACTION NO.

VERSUS                                                17-339-BAJ-EWD

FREDERICK BOUTTE

<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

Before this Court is the application of Staci Alvarado ("Petitioner") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On substantive review, Petitioner has failed to show that any claim adjudicated by the state courts on the merits was contrary to or an unreasonable application of Supreme Court precedent or was an unreasonable determination of the facts in light of the evidence presented.  Accordingly, Petitioner's application should be denied.  There is no need for oral argument or for an evidentiary hearing.

I.    PROCEDURAL HISTORY

On June 10, 2010 Petitioner was charged via indictment in the Eighteenth Judicial District Court for the Parish of West Baton Rouge, State of Louisiana with manslaughter for the stabbing death of her husband, Luis Alvarado ("Luis").  Petitioner was found guilty by a unanimous jury on August 23, 2012, following a 3-day jury trial.[1]  On January 9, 2013, the trial judge sentenced Petitioner to 30 years at hard labor.

Petitioner pursued a direct appeal, asserting the following two assignments of error by the trial court: (1) admission of the first 13 minutes of her videotaped initial police interview and (2) admission of lay opinion testimony from Detective Jeremy Thompson as to Petitioner's reasons for offering a second statement to law enforcement several days after the incident.  The Louisiana First Circuit Court of Appeal ("First Circuit") affirmed Petitioner's conviction and sentence on September 30,

---

[1] Trial Record, pp. 781-82.

2013.  The Louisiana Supreme Court denied review on April 11, 2014.[2]  On July 22, 2014, Petitioner filed an application for post-conviction relief in the state trial court on the following bases: (1) she received ineffective assistance of counsel due to trial counsel's failure to fully investigate and pursue a battered woman's syndrome defense, (2) she received ineffective assistance of counsel due to appellate counsel abandoning issues on appeal, (3) prior bad acts evidence was improperly admitted at trial, and (4) the cumulative effect of the errors at trial rendered her conviction unconstitutional.[3]  On April 4, 2015, at the conclusion of an evidentiary hearing, the trial court denied Petitioner's application for post-conviction relief. The First Circuit denied writ on November 18, 2015 and the Louisiana Supreme Court denied writ on March 31, 2017.  Petitioner timely filed the instant habeas application on May 26, 2017.

## II.    EXHAUSTION

Under 28 U.S.C. § 2254(b) and (c), a claimant seeking habeas corpus relief in federal court is required to exhaust her claims by presenting them for review before the courts of the state of confinement.  The exhaustion requirement is satisfied only when a petitioner's claims have been properly presented to the state's highest court, either on direct review or on post-conviction attack.[4] As a general rule, relief is available on a federal habeas petition only when all the claims in the petition have been exhausted through the state courts.[5]

In this Court, Plaintiff asserts the following six grounds for habeas relief:  Ground 1: whether introduction of the first thirteen minutes of Petitioner's recorded interview the night of the incident violated Petitioner's Fourteenth Amendment due process rights;[6] Ground 2: whether admission of

---

[2] *Id.*
[3] Trial Court Record, p. 854-883.
[4] *Bufalino v. Reno,* 613 F.2d 568, 570 (5th Cir. 1980).
[5] *Rose v. Lundy,* 455 U.S. 509, 510 (1982).
[6] R. Doc. 1-1, pp. 11-12.

Detective Thompson's opinion testimony as to the reason for Petitioner's request to provide a second interview several days after the incident violated her right to due process;[7] Ground 3: ineffective assistance of trial counsel in failing to enter a proper plea, failing to investigate, failing to obtain a critical defense witness, and failing to present evidence of Battered Woman's Syndrome;[8] Ground 4: ineffective assistance of appellate counsel in abandoning issues on direct appeal;[9] Ground 5: whether admission of "prior bad acts" evidence to show motive/intent violated due process;[10] and Ground 6: whether cumulative errors render Petitioner's conviction unconstitutional.[11]

Respondent argues that Petitioner failed to exhaust Grounds 4, 5 and 6.[12] However, the record reflects that Petitioner brought these federal constitutional claims in her July 22, 2014 post-conviction relief ("PCR") application,[13] although the trial court did not specifically rule on those grounds when it rendered its opinion in open court on April 4, 2015 denying the PCR application.[14] A petitioner may exhaust claims even when the "state appellate court chooses to ignore in its opinion a fairly presented federal constitutional claim squarely raised in petitioner's brief in the state court."[15] In *Castille*, the Supreme Court noted that the reason that point was too obvious to merit extended discussion in *Digmon* is because "by then it was well settled that 'once [a] federal claim has been

---

[7] *Id.*, pp. 12-13.
[8] R. Doc. 1-1, pp. 13-17.
[9] R. Doc. 1-1, p. 17.
[10] R. Doc. 1-1, pp 17-18.
[11] R. Doc. 1-1, pp. 18-19.
[12] R. Doc. 8, p. 4.
[13] Trial Court Record, pp. 854-883. *See* "CLAIM NUMBER TWO: Alvarado was denied the effective assistance of Appellate Counsel as Guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution." (Trial Court Record, p. 879); "CLAIM NUMBER THREE: The testimony of Alvarado's alleged 'Prior Bad Acts' were inadmissible as its conflicting substance were used to show motive and/or intent violated Alvarado's due process to a fair trial which is guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution." (*Id.*); CLAIM NUMBER FOUR: The cumulative of [sic] Errors in this case render the conviction unconstitutional." (Trial Court Record p. 882).
[14] Trial Court Record, p. 917. The trial court did blankety find that the allegations of ineffective assistance of counsel in the PCR application was "not well-founded in this matter," which may constitute a ruling on Ground 4 regarding ineffective assistance of appellate counsel.
[15] *Castille v. Peoples*, 489 U.S. 346, 351 (1989), *citing Smith v. Digmon*, 434 U.S. 332, 333 (1978)("[i]t is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court, and, indeed, in this case, vigorously opposed in the State's brief."

*fairly presented* to the state courts, the exhaustion requirement is satisfied.'"[16] After the trial court denied Petitioner's application on April 4, 2015, she sought further review with the First Circuit[17] and the Louisiana Supreme Court.[18] Grounds 4, 5 and 6 are, therefore, exhausted, permitting this Court to engage in substantive review.

Although Respondent does not argue that Ground 2 is unexhausted, after reviewing Petitioner's direct appeal and post-conviction filings, Petitioner failed to exhaust Ground 2.[19]  In this claim Petitioner asserts that her Fourteenth Amendment right to a fundamentally fair trial was violated when the trial court allowed Detective Thompson to offer his opinion about Petitioner's second statement to the police. While being questioned at trial, Detective Thompson testified that he believed Petitioner's second interview with the police was a "self-serving defense."[20] Petitioner's direct appeal brief raised the admission of this testimony as an error based solely on Louisiana law.[21]  On direct appeal, the First Circuit held that Detective Thompson's testimony was a proper inference under the Louisiana Rules of Evidence for lay witnesses. Petitioner has labeled Ground 2 as a Fourteenth Amendment claim in her habeas petition.

While Petitioner does make the same factual allegations based upon the same testimony in her state direct appeal and habeas petition, she has failed to present the same legal theories to both courts. Petitioner did not present any federal constitutional claim to the state court as it relates to this

---

[16] *Castille*, 489 U.S. at 351, *citing Picard v. Connor*, 404 U.S. 270, 275 (1971) (emphasis in *Castille*).

[17] Trial Court Record, p. 922.

[18] Trial Court Record, p. 923.

[19] Petitioner is specifically instructed that this Report and Recommendation shall constitute notice to her that this Court is raising on its own motion the issue of procedural default and that Petitioner must submit any evidence or argument concerning the default as part of any objections she may file to this Report. *See Magouirk v. Phillips,* 144 F.3d 348, 359 (5th Cir. 1998). In addition to the fact that Ground 2 is unexhausted, this claim also lacks merit. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.  *See Porter v. Estelle,* 709 F.2d 944, 957 (5th Cir. 1983). As discussed below in connection with Ground 1, the prosecution presented sufficient evidence of Petitioner's guilt such that Detective Thompson's opinion testimony about the reasons for Petitioner's second statement to the police was not a crucial, highly significant factor in the conviction.

[20] Trial Court Record, pp. 691-692.

[21] Trial Court Record, pp. 821-822.

argument. Instead, she framed the argument only as a violation of Louisiana law. "For purposes of exhaustion it is not enough that all of the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."[22] "Where [a] petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in state court, [s]he fails to satisfy the exhaustion requirement."[23]

If Petitioner were to seek review at the trial court as to Ground 2 now, so as to meet the federal exhaustion requirements, she would be procedurally barred from doing so by La. Code Crim. Proc. Ann. art. 930.4(E), which states that a "successive application shall be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application," or by Article 930.8(A), which states that "[n]o application for post-conviction relief ... shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final...." Nor could Petitioner now seek review of Ground 2 in either the First Circuit or the Louisiana Supreme Court.[24] Thus, Petitioner's Ground 2 is procedurally defaulted, and this Court is barred from undertaking review.[25]

### III.    FACTUAL BACKGROUND

The facts of the case, as set out by the First Circuit, are as follows:

> The defendant and her husband, Luis Alvarado, the victim, together with their four children and the defendant's stepfather, Ronald Aultman, lived in a mobile home on Court Street in Port Allen. On the evening of May 5, 2011, the defendant and Luis began arguing. Their quarrel soon turned physical and the defendant and Luis began striking each other. According to the defendant and Aultman, this violent behavior typified their tumultuous relationship. At some point during the brawl, Aultman heard

---

[22] *Wilder v. Cockrell*, 274 F.3d 255 (5th Cir. 2001), *citing Anderson v. Harless*, 459 U.S. 4 (1982).

[23] *Vela v. Estelle*, 708 F.2d 954, 958, n.5 (5th Cir. 1983).

[24] *See* Uniform Rules, Courts of Appeal, Rule 4–3 ("An application not filed in the appellate court within the time so fixed or extended [by the District Court] shall not be considered, in the absence of a showing that the delay in filing was not due to the applicant's fault."); Supreme Court Rule X, § 5(a) ("An application seeking to review a judgment of the court of appeal ... after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal").

[25] *See Bledsue v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999) ("Procedural default exists where ... the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred" … such that the "petitioner is deemed to have forfeited his federal habeas claim.").

Luis say "call the police." Aultman testified at trial that he took the children across the street so that he could tell a neighbor to call the police because the defendant was stabbing Luis. The neighbor called 911. Officer Dan Cipriano, with the Port Allen City Police Department, was near the defendant's residence when he was radioed that a stabbing was in progress. Within a minute, Officer Cipriano arrived at the scene and went into the mobile home. As he walked through to clear the area, the defendant opened the back bedroom door. The officer ordered the defendant to the ground and handcuffed her. She had blood on her hands. Luis was on the bed with a stab wound to the chest. He died a short time later. A nine inch serrated filet knife was found on the edge of the bed; approximately six inches of the blade had blood on it.

That same night, the defendant was taken to the police station for questioning. Detective Jeremy Thompson, with the Port Allen City Police Department, interviewed the defendant. Six days later, the defendant provided a second statement to Detective Thompson. In her first statement, the defendant indicated she and Luis had been engaged in a physical altercation, but did not remember stabbing him with a knife. In her second statement, the defendant claimed to have remembered that both she and Luis had a knife and that, after she stabbed him, she dropped the knife and ran for help. Both taped statements were played for the jury. The defendant did not testify at trial.[26]

## IV.   STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   Relief is authorized if a state court has arrived at a conclusion contrary to that reached by the Supreme Court on a question of law or if the state court has decided a case differently than the Supreme Court on a set of materially indistinguishable facts.[27]

---

[26] *State v. Alvarado*, 2013-0201, 2013 WL 5459757, at *1 (La. App. 1 Cir. 9/30/13), *writ denied*, 2013-2579 (La. 4/11/14), 137 So. 3d 1214.
[27] *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

Relief is also available if the state court has identified the correct legal principle but has unreasonably applied that principle to the facts of the petitioner's case or has reached a decision based on an unreasonable factual determination.[28]   Mere error by the state court or mere disagreement on the part of this Court with the state court determination is not enough; the standard is one of objective reasonableness.[29]   State court determinations of underlying factual issues are presumed to be correct, and the petitioner has the burden to rebut that presumption with clear and convincing evidence.[30]

V.    SUBSTANTIVE REVIEW

A. Ground 1: Admission of First 13 Minutes of Police Interview, if Error, Was Harmless

During Petitioner's manslaughter trial for the death of her husband, the trial court admitted into evidence, over numerous objections by the defense, the first 13 minutes of Petitioner's initial interview with police.[31]   The first 13 minutes of the video show Petitioner alone in the police interview room before the interviewing officer arrives. At points in the video, Petitioner is quiet and has her head down.   At other points, Petitioner is agitated and makes outbursts about the police's lack of competency. Some of Petitioner's outbursts are profanity-laced and she uses the racial slur "n****r" once.[32]   A substantial amount of the trial transcript is dedicated to the parties arguing over the admissibility of the first 13 minutes of the videotaped interview, with the trial judge changing his mind multiple times before finally deciding to admit the disputed portion of the interview.[33]

---

[28] *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).

[29] *Id.  See also Williams*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").

[30] 28 U.S.C. § 2254(e)(1).

[31] Trial Court Record, p. 662; "Thompson-31."

[32] The racial composition of the jury is not clear from the record, although the trial judge does reference that there are African American members of the jury.   Trial Court Record, p. 455.   While Petitioner and the trial court expressed particular concern about the potential prejudice with African American jurors associated Petitioner's statement of "fat, n****r, honky motherf***ers," she also refers to "white a**holes," "white motherf***ers," "white crooked cops," and states "I'll find your white ass," along with a host of non-racial profanities.   Also, of the visible interactions with police officers in the disputed portion of the video, Petitioner appears to comply with the African American officer, who comes into the room to get her to sit down and complies with him handcuffing her later while she is yelling at a Caucasian officer.

[33] Trial Court Record, pp. 454, 461, 478, 516, 650.

On direct appeal, Petitioner argued that admission of the first 13 minutes of her initial police interview was a violation of Louisiana evidentiary law. She also argued that United States Supreme Court precedent calls for reversal of a conviction when there is a "reasonable possibility that the irrelevant, circumstantial and unduly prejudicial character evidence might have contributed to the verdict."[34] The First Circuit concluded that the admission was error because the video was too attenuated in time to show that Petitioner was the aggressor in the incident, but that the error was harmless under the Louisiana Code of Criminal Procedure and the United States Supreme Court case of *Sullivan v. Louisiana*.[35] Petitioner does not establish that the First Circuit's ruling was contrary to or an unreasonable application of Supreme Court precedent, nor an unreasonable determination of the facts in light of the evidence presented at trial.

In general, "questions relating to the admissibility of evidence are matters of state law" and are not appropriate for habeas corpus proceedings.[36] Habeas relief will only be granted "for errors in a trial court's evidentiary rulings" where "those errors result in a 'denial of fundamental fairness.'"[37] Admission of improper evidence may rise to a constitutional claim cognizable under the Due Process Clause of the Fourteenth Amendment "when evidence 'is so extremely unfair that its admission violates fundamental concepts of justice.'"[38] Even if the admission of evidence was constitutional error, the claim still fails if the petitioner has not shown that the evidence had a "substantial and injurious effect or influence in determining the jury's verdict."[39]

---

[34] Trial Court Record, p. 821.

[35] *State v. Alvarado*, 2013 WL 5459757, at *4 ("Therefore, the evidence established both that Luis was not armed when he was stabbed by the defendant in the bedroom and that, at the moment the defendant stabbed Luis, she was the aggressor and not acting in self-defense. The State's evidence clearly established the defendant's guilt. As such, the guilty verdict rendered was surely not attributable to the evidence of the first thirteen minutes of the defendant's initial interview. Any error in allowing such evidence to be presented to the jury was harmless beyond a reasonable doubt. *See* La.C.Cr.P. art. 921; *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).").

[36] *Taylor v. Maggio*, 581 F.Supp. 359, 365–66 (E.D. La. Feb. 15, 1984).

[37] *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir.1998).

[38] *Coble v. Davis*, 728 Fed.Appx. 297, 302 (5th Cir. 2018), *quoting Perry v. New Hampshire*, 556 U.S. 228 (2012) (quoting *Dowling v. United States*, 493 U.S. 342 (1990)).

[39] *Janecka v. Cockrell*, 301 F.3d 316, 328–29 (5th Cir. 2002), *quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

1. **Petitioner has failed to show that admission of the first 13 minutes of her police interview had a substantial and injurious influence on the verdict.**

In *Brecht v. Abramson*, relied on by Petitioner, the Supreme Court distinguished between two types of errors that may occur in a state criminal proceeding: "structural errors," which affect the most basic elements of a criminal trial (*e.g.*, biased judge or denial of counsel to defendant); and "trial errors," which are other errors that may occur during the course of a trial that are deemed less significant than structural errors. Additionally, the Supreme Court declined to extend the standard that error must be harmless beyond a reasonable doubt to cases on collateral, rather than direct, review. In adopting the lesser standard, the Court stated: "[I]t hardly bears repeating that 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'"[40] "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[41]

At the outset, the admission of the first 13 minutes of Petitioner's interview is a trial, rather than a structural, error.[42] Even if the admission of this evidence was constitutional error, the Petitioner's claim fails if she cannot show that the evidence had a "substantial and injurious effect or influence in determining the jury's verdict."

Whether the erroneous admission of this evidence was "harmless" depends on a host of factors, including (1) the importance of the evidence in the prosecution's case, (2) whether the evidence was cumulative, (3) the presence or absence of other evidence corroborating or contradicting the evidence in question, and (4) the overall strength of the prosecution's case against the defendant.[43]

---

[40] 507 U.S. 619, 634 (cleaned up).
[41] *Kotteakos v. United States,* 328 U.S. 750, 764-65 (1946).
[42] Wrongful evidentiary admissions are "but 'classic trial errors.'" *Cupit v. Whitley*, 28 F.3d 532, 538 (5th Cir. 1994).
[43] *See Cupit,* 28 F.3d at 539.

Of these, the strength of the prosecution's case is probably the most important.[44] Because it is a trial error that did not have a "substantial and injurious effect or influence on the jury's verdict," the admission of the first 13 minutes of Petitioner's first interview did not result in a denial of due process. The videotaped interviews of Petitioner were the last items of evidence submitted prior to closing arguments. Before the tapes were played and the jury witnessed Petitioner's use of a racial slur and foul language, four witnesses provided testimony, and reports were admitted, which established the prosecution's case for manslaughter against Petitioner.

### 2. Witness Testimony and Documentary Evidence

Neighbor, Katherine Atkinson ("Atkinson"), was the first witness to testify. Atkinson called 911 on the night of the victim's death at the behest of Aultman (Petitioner's stepfather, who resided in the home with Petitioner and the victim).[45] According to Atkinson, when Aultman ran over to her house the night of the incident, Aultman told her Petitioner was stabbing Luis.[46] Atkinson acknowledged that she did not see the fight between the victim and Petitioner the night she called 911, but testified that the victim and Petitioner had an abusive relationship and that Petitioner was the aggressor most of the time during the fights.[47] Atkinson also testified that one or two days before the victim's death she saw Petitioner pick up a knife during a fight between Petitioner and the victim.[48] According to Atkinson, she called the police during this earlier fight too and Luis was not fighting back. Atkinson testified that she never saw Luis hit Petitioner in the six months she lived by them.

Port Allen police officer Dan Cipriano, the first officer to respond to the 911 call, also testified at trial. When Officer Cipriano arrived at the mobile home, Aultman and the children were on the

---

[44] *Id.*
[45] Trial Court Record, pp. 522-531.
[46] Trial Court Record, p. 522.
[47] Trial Court Record, pp. 523, 526.
[48] Trial Court Record, pp. 528-529.

patio.[49] Officer Cipriano testified that Aultman said, "Hurry, she is killing him."[50] On cross-examination Officer Cipriano acknowledged that his incident report indicated Aultman said, "Hurry, they are fighting," but testified that the report was erroneous because he remembered what Aultman said.[51]  When Officer Cipriano entered the home and approached the back bedroom he encountered Petitioner. Officer Cipriano testified that Petitioner said, "I didn't do anything" as he was arresting her, which he suggested is inconsistent with self-defense.[52]  He also testified that Petitioner never told him that the victim was about to stab her.[53]  When showed photographs of Petitioner from the night of the victim's death, Officer Cipriano acknowledged that he saw some discoloration around her neck, but testified that he saw nothing on Petitioner that appeared to be bruising from being choked.[54]

Aultman testified next.  His testimony was internally inconsistent, as well as inconsistent with statements given to police before trial. In its harmless error discussion on direct appeal, the First Circuit found that there was "overwhelming evidence" of Petitioner's guilt without any reliance on Aultman's testimony.[55]  Consistent with the First Circuit's analysis, a determination can be made that the first 13 minutes of the videotape did not have a "substantial and injurious effect" on the verdict without reference to Aultman's testimony.[56]

---

[49] Trial Court Record, p. 534.
[50] Trial Court Record, p. 542.
[51] Trial Court Record, pp. 548-549.
[52] Trial Court Record, p. 550-551.
[53] Trial Court Record, p. 551.
[54] Trial Court Record, pp. 543, 553.
[55] *State v. Alvarado*, 2013 WL 5459757, at *3.
[56] Aultman stated to police on the night of the victim's death that the fight was not the victim's fault, he saw Petitioner on top of the victim, saw the victim run into the bedroom bleeding from the head and heard the victim say, "call the police," and he told the police "she is killing him" when they arrived on the scene. Aultman's trial testimony was consistent with his taped statement in that he testified that he saw Petitioner on top of the victim on the couch beating the victim on the head, and he saw the victim run into the bedroom and heard him say, "Call the police." Aultman's trial testimony was inconsistent with his taped statement in that he testified: he believed the victim started the fight because the victim just learned that one his children with Petitioner was fathered by his brother, he was scared of the victim, the victim was "beating her down like a dog" and she defended herself, he saw the victim kicking Petitioner, and he lied to the police the night of the victim's death because he was afraid they were going to take his grandchildren (Trial Court Record, "Aultman-1;" pp. 561-563, 566, 575, 583, 585-586, 587, 595). Aultman made statements during his trial testimony further complicating any determination of the quality of the evidence he offered, including "I don't care what y'all do with her. Like I said on that tape, I tell you again, take her in the woods, give me the gun, I'll put a bullet in her

The parties stipulated to the contents of the autopsy report and the crime lab report, which were read to the jury. The autopsy concluded that the cause of death was a "penetrating sharp force injury to the right anterior thorax, right middle lobe, lung, pericardium, aortic and pulmonary roots with right hemopneumothorax and hemopericardium."[57] The DNA profile from the knife showed that the victim's DNA was on the blade of the knife. It also showed that the handle of the knife contained DNA from the victim, Petitioner, and a member of the Port Allen Police Department.[58] Additionally, the autopsy report noted "two lacerations to the left occipital scalp measuring 2.2 cm and 1.9 cm, respectively 4.0 cm and 3.0 cm left lateral to mid-coronal line. The scalp surrounding the lacerations is contused." Photographs of Luis's head contusions were also admitted into evidence.[59]

Detective Jeremy Thompson was the last witness to testify at trial. He conducted the investigation and took both recorded statements from Petitioner. Detective Thompson testified that only one knife was found in the bedroom[60]and that knife had six inches of blood on the blade.[61] Detective Thompson also testified that he saw defensive wounds on the victim's body during the autopsy.[62] According to Thompson, he searched the bedroom where the stabbing occurred and did not find any other knives in that room, which is inconsistent with Petitioner's second recorded interview in which she stated Luis also had a knife in the bedroom.

The first interview and the second interview were played for the jury following Detective Thompson's testimony. Although Petitioner makes much of the prejudicial effect of the first thirteen

---

head." He also told the court that he taught Petitioner to fist fight when she was 8 or 9 years old and they often engaged in physical altercations when she was a child (Trial Court Record, pp. 566, 595).
[57] Trial Court Record, p. 613; "State 2."
[58] Trial Court Record, p. 613; "State 1." Detective Thompson testified that his DNA was found on the knife because he touched it with his hand while securing it in the evidence box (Trial Court Record, p. 619).
[59] Trial Court Record, p. 609; "Suarez 2, 4, & 5."
[60] Trial Court Record, p. 688.
[61] Trial Court Record, p. 621.
[62] Trial Court Record, p. 690.

minutes of the first interview, that evidence must be judged against the entire record, including the remainder of the first interview and the second interview.

### 3. First Recorded Police Interview

For approximately the first two minutes of the first interview, Petitioner is completely silent and appears to be sleeping. She does have outbursts of profanity-laced tirades during the first thirteen minutes, although she also says she is going to turn off the lights and go to sleep at one point. Additionally, there are instances where Petitioner is not visible in the video because she presumably has her head down on the table. In short, this is not an uninterrupted thirteen minutes of Petitioner screaming curse words and breaking furniture.

In the portion of the first video interview that is not in dispute (once Detective Thompson arrives), Petitioner still curses and acts belligerently. For example, she states three times that "if she goes to jail … she is f***ing someone up" while Detective Thompson is trying to advise her of her rights. Petitioner tells Detective Thompson that she does not remember what happened. She admits on questioning that she held Luis face down on the sofa and hit him with the bell, although she says she hit him in the shoulder, and specifically denies hitting him in the head. She further states that Luis did not pick up a knife and stab at her, nor did he pick up anything and hit her. Toward the end of the first interview, Petitioner is told by police officers that Luis has died. She breaks down sobbing, says she "can't live without him," and falls down on her knees crying out "no."

### 4. Second Recorded Police Interview

Seven days later Petitioner asked to speak with Detective Thompson and gave a second interview.[63] During the second interview Petitioner states that she and Luis both had knives in the bedroom. She says the fighting started in the living room and Luis had the filet knife, which he put

---

[63] Trial Court Record, p. 675.

13

to her neck backwards and "choked her out." She admits he walked into the bedroom and she entered the bedroom at some time later to get her cigarettes. She states multiple times that she does not know if Luis walked forward (into the knife) or if she did or they did at the same time. According to Petitioner, the knife she had during the encounter was a two-pronged knife. Detective Thompson advises her during the interview that the knife she is describing is not the knife that killed Luis and that he did not see a two-pronged knife like the one described by Petitioner in the bedroom where the stabbing occurred.[64] Detective Thompson also questions Petitioner's characterization that she "pricked" Luis with the knife, advising her that the depth of the stab wound was too significant to have been accidental.

While it is of concern that the prosecution essentially argued that Petitioner's behavior in the disputed portion of the video established her guilt,[65] and that the trial judge did not provide a limiting instruction to the jury notwithstanding his concerns about the potential prejudice of the first thirteen minutes of Petitioner's first interview,[66] the prosecution's case for manslaughter was established through sufficient independent evidence to alleviate grave doubt as to the impact of the disputed video footage. The jury heard that Petitioner and the victim often had physical altercations during which Petitioner was the aggressor; Petitioner was seen a day or two before the stabbing brandishing a knife during an altercation with Luis where he was not fighting back; Petitioner told the arresting officer on the scene, "I didn't do anything," which is inconsistent with self-defense; Petitioner never told the

---

[64] This is also consistent with Detective Thompson's trial testimony. Trial Court Record, pp. 676-77; 687-88.

[65] Trial Court Record, p. 725 ("Now, you saw those 13 minutes on that tape that we sat patiently and let you see. You saw her cursing, calling them names, that is who Staci is, that's the real picture. That's why it was so important here-I know it was painstaking to watch it-but that's who she is. If she doesn't get her way, she will F.U up, you heard her, M-F doughnut eating, whatever she said, every name but the child of God. That lady is dangerous. Now it would have been hard pressed on opening for me to get up here and really get into details with you about what you were going to see, you had to see it with your own eyes. And I watched you. Believe it or not, there are some women who abuse men and there she is (indicating the defendant).").

[66] See Trial Court Record, pp. 455, 477-478. The jury was instructed that the arguments of counsel are not evidence. Trial Court Record, p. 762.

police that the victim was going to stab her; the autopsy report indicated a deep penetrating sharp force injury and the knife had six inches of blood on the blade, which is inconsistent with Petitioner's statement that she thought she "pricked" Luis with the knife; defensive wounds were found on the victim's body at autopsy; there was no second knife found in the bedroom; the knife Petitioner describes that she was holding in the second interview was not located in the bedroom and the wounds Luis suffered were inconsistent with the two-pronged knife Petitioner describes. Additionally, the jury was permitted to hear Petitioner's statements about Luis's abuse in the second interview and to watch her reaction when she finds out during the first interview that Luis has died. Considering this evidence, it cannot be said that the use of a racial slur or foul language at the beginning of the first interview, presented at the close of the prosecution's case, had a substantial and injurious influence on the jury's verdict. The First Circuit's finding of harmless error was neither contrary to nor an unreasonable application of federal law.[67] Accordingly, Ground 1 is without merit and should be dismissed.

### B. Ground 3: Ineffective Assistance of Trial Counsel

In Ground 3, Petitioner asserts that she received ineffective assistance due to trial counsel's failure to enter a proper plea, failure to investigate, failure to obtain a critical witness, and failure to present a "Battered Woman's Syndrome" defense. Petitioner claims that counsel should have advised her to enter a plea of "not guilty and not guilty by reason of insanity," counsel failed to investigate instances of abuse between Petitioner and the victim, and counsel failed to call an expert to testify she suffered from Battered Woman's Syndrome. Petitioner presented this claim to the state courts in

---

[67] *Wesbrook v. Thaler*, 585 F.3d 245, 255–56 (5th Cir. 2009) (habeas relief only available if state court applied harmless error review in objectively unreasonable manner). *See also, U.S. v. Owens*, 724 Fed. Appx. 289, 299 (5th Cir. 2018), *cert. denied sub nom. Parker v. U.S.*, 139 S. Ct. 220, 202 L. Ed. 2d 150 (2018) (finding that admission of evidence of racially charged statements and tattoos, although not probative, was harmless error because there was significant evidence against defendant).

her port-conviction application. In open court on February 4, 2015, the trial court denied Petitioner's application on this claim as unfounded.[68]

A habeas petitioner who asserts that she was provided with ineffective assistance of counsel must meet the *Strickland* standard by affirmatively showing: (1) that her counsel's performance was "deficient," *i.e.*, that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced her defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial in which the result is reliable.[69]  The petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel.[70]

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that her counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.[71]  The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.[72]  This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.[73]  Great deference is given to counsel's exercise of professional judgment.[74]

If the petitioner satisfies the first prong of the *Strickland* test, her petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors.[75] To satisfy the prejudice prong

---

[68] Trial Court Record, p. 917.

[69] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[70] *Id*.

[71] *See, e.g., Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986).

[72] *See, e.g., Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).

[73] *Martin*, 796 F.2d at 817.

[74] *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816.

[75] *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988).

of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.[76] Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.[77] The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome."[78] Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply in tandem, the review by federal courts is "doubly deferential."[79]

The record reflects that defense counsel made a strategic decision to take the position at trial that Luis was the aggressor at the time of the stabbing.[80] The trial testimony revealed that Petitioner and the victim had a violent relationship. The trial court record also reflects that trial counsel had concerns about the introduction of Petitioner's prior criminal history.[81] It cannot be said that counsel's decision to avoid a defense that could open the door to the admission of Petitioner's criminal history, particularly with regard to her own arrests for fights with Luis, was outside the realm of professional competence. Additionally, there was evidence presented that Luis abused Petitioner the night of the incident and throughout their relationship. In the second police interview, when describing the events leading up to the stabbing, Petitioner states that Luis threatened her with a knife and "choked her out," that he picked her up by her hair and drug her across the floor that night, that

---

[76] *Strickland v. Washington*, 466 U.S. at 693.
[77] *Martin v. McCotter*, 796 F.2d at 816.
[78] *Martin*, 796 F.2d at 816-17.
[79] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).
[80] Trial Court Record, pp. 469-470, 565, 569.
[81] Trial Court Record, p. 565, 569.

Luis also had a knife in the bedroom and that she was defending/protecting herself and her kids.[82]  In that interview she also discusses ongoing abuse by Luis, including stating that he "always threatened her with a knife."

Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.[83]  Thus, petitioners making claims of ineffective assistance based on the failure to call a witness must demonstrate prejudice by "nam[ing] the witness, demonstrat[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been favorable to a particular defense."[84]  This requirement applies to both lay and expert uncalled witnesses.[85]

Petitioner fails to identify an expert that would have been willing to testify that she fit the criteria for Battered Woman's Syndrome and fails to articulate specific information that she believes Dr. Suarez (the coroner) would have provided if testifying live.[86]  As noted above, the decision not to pursue testimony in support of a defense that would have opened the door to Petitioner's prior criminal conduct cannot be said to be outside the realm of sound professional judgment.  Under *Strickland*, the Court presumes that counsel's decision to forego calling the expert to testify was a sound strategy choice. Petitioner has failed to overcome that presumption.

---

[82] "Thompson 32."  Petitioner also complains that photographs showing Luis's injuries were introduced at trial but trial counsel failed to introduce photographs of Petitioner that would have shown a struggle between them.  R. Doc. 1-1, p. 16. In fact, photographs of Petitioner were shown to Officer Cipriano and Detective Thompson, however, it was their opinion that the photographs did not show defensive wounds on Petitioner.  Trial Court Record, p. 553 (Officer Cipriano testified no obvious bruises on Petitioner the day of the incident); p. 691 (Detective Thompson testified he did not see defensive wounds on Petitioner).

[83] *See Woodfox v. Cain,* 609 F.3d 774, 808 (5th Cir.2010).

[84] *Woodfox,* 609 F.3d at 808 (quoting *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir.2009)).

[85] *Id.*

[86] Petitioner complains only that "Had Counsel called the coroner, Dr. Suarez as a witness to testify there could have been additional avenues and information that could have been brought to light."  R. Doc. 1-1, p. 17.

Regardless of the strategic decisions of trial counsel, for the same reasons as Ground 1, even if counsel committed error, such error was harmless. Ground 3 is without merit and should be dismissed.

### C.  Ground 4: Ineffective Assistance of Appellate Counsel

In Ground 4, Petitioner asserts that she received ineffective assistance of counsel from her appellate counsel because appellate counsel "abandoned issues on direct appeal, such as the objections noted and failed to litigate claims and failed to take her to a higher court." Petitioner does not elaborate on what issues she believes her appellate counsel failed to litigate on direct appeal.[87] Although the Court construes *pro se* habeas petitions liberally, mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue.[88]  Petitioner's vague references to abandoned claims on direct appeal are insufficient to raise a Sixth Amendment issue.

### D.  Ground 5: Admission of Prior Bad Acts

In Ground 5, Petitioner asserts that her Sixth and Fourteenth Amendment rights to due process were violated when the trial court allowed testimony of five prior crimes. Petitioner does not state what five prior crimes were improperly admitted into evidence. Self-represented litigant's pleadings are still required to explain or identify specific facts in support of their claims.[89]  It is not the court's duty to sift through the record for evidence that supports a litigant's contentions.[90] Because Petitioner does not set forth the facts that form the basis for Ground 5, the Court cannot grant relief.

---

[87] Petitioner also did not elaborate on these issues in her PCR application.  Trial Court Record, p. 879.
[88] *U.S. v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993).
[89] *See e.g, United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015), *citing Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993)); *Bookman v. Shubzda*, 945 F.Supp. 999, 1004–05 (N.D. Tex. 1996) (a *pro se* litigant has an obligation to support his claims).
[90] *Green v. Johnson*, 160 F.3d 1029, 1036 n.2 (5th Cir. 1998) (it is not the court's job "to go on a fishing expedition through the record to find facts favoring or disfavoring [a habeas petitioner's] arguments").

### E.  Ground 6: Cumulative Errors

In Ground 6, Petitioner asserts that cumulative errors resulted in a violation of her Fourteenth Amendment rights. Petitioner argues that the combined effect of the prejudicial character evidence in the first 13 minutes of her initial police interview and the ineffective assistance she received from trial counsel rendered her trial fundamentally unfair. "Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process."[91]  Because any potential error under Grounds 1 or 3 did not result in a fundamentally unfair trial and Petitioner does not provide sufficient facts to support her claims of error as to Grounds 4 or 5, cumulative error is not a basis for habeas relief in this case.

### VI.    CERTIFICATE OF APPEALABILITY

Should Petitioner pursue an appeal, a certificate of appealability should also be denied.  An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."[92]   Although Petitioner has not yet filed a notice of appeal, the Court may address whether she would be entitled to a certificate of appealability.[93]   A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.[94]  In cases where the Court has rejected a petitioner's constitutional claims on procedural grounds, a petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of a denial of constitutional right and that jurists of reason would find it debatable whether the district court was correct in its

---

[91] *Derden v. McNeel,* 978 F.2d 1453, 1454 (5th Cir.1992) (*en banc*) (internal quotations and citations omitted).
[92] 28 U.S.C. § 2253(c)(1)(A).
[93] *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).
[94] 28 U.S.C. § 2253(c)(2).

procedural ruling."[95]  In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[96] In the instant case, reasonable jurists would not debate the denial of Petitioner's application or the correctness of the procedural or substantive rulings.  Accordingly, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability should be denied.

**VII.    RECOMMENDATION**

**IT IS RECOMMENDED** that Petitioner's application for habeas corpus relief[97] be **DENIED** and that this proceeding be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability be **DENIED**.

**IT IS ORDERED** that Petitioner's request for writ of mandamus ("Mandamus")[98] is **DENIED AS MOOT**.  The Mandamus seeks a ruling on Petitioner's habeas application.  After a thorough review of the briefing and record, this Report and Recommendation recommends denial of Petitioner's application.  Petitioner has 14 days to file objections to the proposed findings and recommendations in the Report and Recommendation, which will then be considered by the assigned district judge for a *de novo* determination.

Signed in Baton Rouge, Louisiana, on August 28, 2020.

Erin Wilder-Doomes

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[95] *Ruiz v. Quarterman*, 460 F.3d 638, 642 (5th Cir. 2006).
[96] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).
[97] R. Doc. 1.
[98] R. Doc. 11.